UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'09 CIV 4783

------------------------------------------------------------X

CHRISTOPHER BOGART, as assignee of
Churchill Capital Partners LLC,

                      Plaintiff,

        -against-

ISRAEL AEROSPACE INDUSTRIES LTD.,

                   Defendant.

:    No.

:

:    **COMPLAINT**



RECEIVED
MAY 2 1 2009
U.S.D.C. S.D. N.Y.
CASHIERS

------------------------------------------------------------X

    Plaintiff, CHRISTOPHER BOGART, as assignee of Churchill Capital Partners LLC ("Churchill Capital"), by his attorneys, for his Complaint, alleges as follows:

### NATURE OF THE ACTION

    1.    This action arises from the bad faith and purposefully damaging conduct of defendant Israel Aerospace Industries Ltd. ("IAI") in connection with a proposed merger between Churchill Ventures Ltd. ("Churchill") and ImageSat International N.V. ("ImageSat"). IAI's self-serving interference and manipulation of the parties to the merger process resulted in the wanton destruction of the merger. IAI's destruction of the merger also made it impossible for Churchill to achieve any business combination before the deadline by which it was required to do so or liquidate, thereby directly and knowingly causing millions of dollars in losses to Churchill Capital.

    2.    This is not a case of sour grapes over a failed merger. Rather, this is a case of IAI's cold, calculated deception and bad faith causing directly foreseeable and purposeless economic harm – a type of business conduct so far outside the range of acceptable behavior that

it crossed the line separating aggressive business practices from wrongful ones, and created liability for IAI.

3.    ImageSat came to Churchill and proposed a merger.   Churchill spent months working toward a deal.   IAI is ImageSat's founder and largest shareholder, and effectively controls ImageSat.

4.    For months, IAI played an active and ostensibly constructive role in the deal discussions, including by facilitating Churchill's direct price negotiations with ImageSat's other shareholders, many of whom were either already suing or threatening to sue IAI for its actions concerning ImageSat.   IAI misused the merger negotiation process by causing Churchill to reach agreement with each of the other significant shareholder constituencies regarding what it would cost to liquidate their respective interests and claims.   Then, at the eleventh hour, IAI acted tortiously and in bad faith to scuttle the merger, knowing that Churchill would have no choice but to dissolve and liquidate as a result.

5.    Following the merger's failure, Churchill did indeed liquidate, and its sponsors lost millions of dollars due directly to IAI's misconduct.   That Churchill Capital, the vehicle for Churchill's sponsors, would inevitably suffer these losses as a result of IAI's behavior was known to IAI.   The sponsors now sue to recover their losses.

6.    Churchill, a Delaware public company traded on the American Stock Exchange and headquartered in New York, was a special purpose acquisition company, or "SPAC". SPACs raise capital from public investors and use that capital to acquire businesses, with the added feature that by merging with a SPAC, the acquired business effectively becomes publicly traded.   Churchill raised $110 million in an offering underwritten by Bank of America ("BofA"). SPACs in total have raised more than $20 billion in capital in the last four years.

7.    A key feature of SPACs is that they have a short, finite time to complete an acquisition and deploy their capital. If they do not consummate a deal in time, they are required to cease operations and return the capital raised to their public investors, a result that necessarily causes multi-million-dollar losses for the SPAC's sponsors. These structural features of Churchill were well known to IAI. Churchill's executives briefed IAI extensively on them and also made a full presentation of these critical deal constraints to ImageSat's board of directors, which includes three designees of IAI (two of whom are senior IAI corporate officers).

8.    IAI is a multi-billion-dollar defense contractor. Its 2008 revenues were $3.6 billion. IAI is a sophisticated global company with experienced senior management. The ImageSat transaction received significant attention from corporate officers at the very top of the IAI corporate hierarchy, all of whom have post-graduate education (many in the United States), and all of whom speak English and are accustomed to doing business in the United States. The IAI team on the Churchill transaction included Itzhak Nissan, IAI's CEO; Yehoshua "Shuki" Eldar, one of Nissan's top deputies; David Arzi, another deputy of Nissan's who also serves as Executive Chairman and a director of ImageSat; and Aryeh Klein, Esq., a former lawyer at the Proskauer firm who now occupies a senior legal and business affairs position at IAI. IAI told Churchill that its board of directors had discussed the Churchill transaction repeatedly and had ultimately approved the transaction.

9.    ImageSat was an interesting company to Churchill. It is the only non-American commercial operator of high-resolution earth observation satellites in the world. As a non-American operator, ImageSat enjoys certain competitive advantages relative to American commercial imaging satellite operators. High-resolution imagery, once restricted to military applications, has become very popular around the world and powers significant commercial undertakings such as Google Earth. ImageSat was, at its inception, a vehicle for IAI to attract

investment capital for the commercialization of Israeli space technology. ImageSat has remained very much in IAI's orbit. For example, ImageSat's current CEO, Shimon Eckhaus, was named to that position by IAI while serving as IAI's own deputy chief executive officer. There are numerous operational entanglements between the two entities, many of which are reflected in a series of written agreements.

10.     However, ImageSat was also a deeply troubled company. Its shareholders other than IAI were in open revolt. The board of directors was dysfunctional. Two lawsuits by its securityholders were pending and more were threatened. Although IAI had created ImageSat to commercialize its own high-resolution satellite technology and to bring private capital into the effort, things had not gone as planned. IAI now faced the prospect of considerable liability and prolonged litigation arising from its involvement in ImageSat.

11.     Churchill's available pool of cash and status as a public company made it a viable path forward for ImageSat. The existing shareholders could be bought out, the litigation and claims could be resolved, and the company could have a fresh start as a restructured public company with a clean capital structure.

12.     Thus, in April 2008, at the instance of ImageSat's largest U.S. investors, ImageSat approached Churchill to suggest a merger. This occurred more than a year after Churchill's formation and with only months of Churchill's life remaining. Churchill was already engaged in merger discussions with other potential partners, but added ImageSat to the pool of transactions under consideration and commenced discussions. Churchill was repeatedly assured of the seriousness of ImageSat's and IAI's interest in pursuing a transaction.

13.     In May 2008, an ImageSat-Churchill transaction gained substantial momentum. A committee of ImageSat's board of directors was appointed to meet with Churchill. Later in May, Churchill's sponsors were asked to make a lengthy and detailed presentation to ImageSat's

full board of directors, which included a number of IAI representatives, including Arzi as well as Gino Piperno-Beer, who is IAI's Treasurer and Deputy Vice President of Finance. Churchill received positive feedback on the meeting and was told that the parties should proceed down the path toward a business combination.

14.    With a transaction under active discussion, Churchill began devoting substantial resources to ImageSat, including substantial management time. It hired advisors to pursue a transaction, including BofA as its investment banker and the Paul Weiss firm as corporate counsel. IAI was well aware of Churchill's actions; indeed, Paul Weiss was co-counsel to IAI in an ImageSat-related litigation matter, and thus IAI's consent was needed and obtained for a conflict waiver before Paul Weiss could be retained by Churchill.

15.    In the June through September 2008 period, assured of ImageSat's and IAI's commitment to a transaction, Churchill continued to devote enormous resources to the ImageSat merger. Efforts included numerous meetings in New York and trips to Israel by Churchill's executives and a team of investment bankers, extensive due diligence of ImageSat, lengthy and detailed strategy and transaction discussions with IAI, and extensive work with lawyers, bankers, and others. IAI and ImageSat repeatedly told Churchill and Churchill's sponsors that they were committed to a transaction. Indeed, ImageSat, IAI, and Churchill negotiated a lengthy and detailed letter of intent which was approved by the IAI executives in charge of ImageSat and executed by ImageSat on September 4, 2008. IAI also executed its own letter agreement with Churchill as of September 10, 2008, which was signed personally by Itzhak Nissan, IAI's CEO.

16.    IAI continued driving the Churchill merger forward. Indeed, the structure of the proposed transaction changed at one point so as not even to include ImageSat as a party, but rather had IAI and other shareholders selling their interests directly to Churchill. IAI led and drove the deal discussions, including a marathon strategy session at IAI's offices in September

2008. At IAI's behest, Churchill became actively engaged in directly negotiating with various ImageSat minority shareholders regarding what amount would be sufficient to induce them to sell their ImageSat shares into the merger and drop their actual or potential litigation claims against IAI and ImageSat.

17.    Churchill essentially stopped dealing substantively with ImageSat and instead worked with IAI to cause the transaction to progress. IAI emphasized to Churchill that it viewed the ImageSat transaction as a way to resolve the existing and threatened claims against IAI and that its completion was a corporate priority for IAI. IAI was fully aware that time was running out in Churchill's life cycle, and that the time was fast approaching by which a deal needed to be completed. IAI also knew that a last-minute deal failure would leave Churchill without time to explore alternative options and result in a liquidation costing the sponsors millions of dollars. Nevertheless, on September 25, 2008, IAI represented to Churchill that it had taken the ImageSat transaction to IAI's board of directors for approval – and that such board approval was obtained. Churchill relied on this representation in proceeding with the transaction.

18.    Then, at virtually the 59th minute of the 11th hour, when Churchill was in the process of preparing for a public announcement of the ImageSat transaction, IAI deliberately torpedoed the deal. In an e-mail dated October 7, 2008, IAI provided what it called its "initial comments" on a deal that had been proceeding for more than six months and had already been approved by the IAI board of directors more than once. Those "comments" were fundamental amendments to the substantive terms of an already-negotiated transaction, which IAI knew could not possibly have been acceptable to other necessary parties to the transaction and which in some cases IAI knew would be literally impossible to comply with in the short time remaining.

19.    As a result of IAI's unreasonable last-minute demands, and despite heroic efforts by Churchill and its sponsors to resuscitate the merger, the deal failed. Churchill then liquidated

and its sponsors lost their entire investment of more than three million shares of common stock and five million warrants, which would have had a value at closing in excess of $34 million. The sponsors' cash losses alone exceeded $5 million.

20.    The chronology demonstrates that IAI never had a sincere interest in merging ImageSat with Churchill and that its purported participation in extensive discussions and negotiations relating to the acquisition was a sham. Rather, IAI's goals were to ascertain the minimum amounts that other parties, such as the minority shareholders who were suing it, might accept in a buy-out of their shares and settlement of their claims, to delay the pending litigations and threatened future litigations while the sham negotiations were underway, and perhaps to raise and then dash hopes that the disputes might be resolved. In the process, IAI knowingly, wrongfully, and tortiously victimized Churchill and its sponsors for its own ends.

21.    That bad faith and tortious behavior had the foreseeable effect of gravely damaging Churchill's sponsors. The sponsors, who funded plaintiff Churchill Capital, foreseeably and necessarily lost their entire multi-million-dollar million investment as well as the return they should have enjoyed on it because IAI destroyed Churchill's acquisition of ImageSat after it was too late for Churchill to pursue and close another transaction. This is not a run-of-the-mill case of a jilted suitor in a deal that simply failed to get done, but rather a cunning and actionable plot by IAI to advantage itself at innocent parties' expense. Under these circumstances, IAI should be accountable for the harm that it knowingly, intentionally, and wrongfully caused to the sponsors of Churchill.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject-matter of this action pursuant to 28 U.S.C. § 1332(a)(2) in that the controversy is between a citizen of a State and a citizen or subject of a foreign State. Plaintiff is a natural person and a citizen of the State of New York.

Defendant is an Israeli corporation with its principal place of business in Israel.  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.    Venue is proper in this District.

## PARTIES

24.    Plaintiff, Christopher Bogart, is a natural person and a citizen of the State of New York.  Plaintiff is the assignee of all claims formerly owned by Churchill Capital, which was a Delaware LLC doing business in New York, and which was dissolved contemporaneously with the liquidation and dissolution of Churchill in December 2008.  The assignment by Churchill Capital to Plaintiff was not improperly or collusively made to invoke the jurisdiction of this Court.

25.    Defendant, IAI, is an Israeli corporation with its principal place of business in Israel.  IAI regularly transacts business in the State of New York and elsewhere throughout the United States.

## FACTS

26.    Churchill was incorporated in Delaware in June 2006, and shortly thereafter filed a registration statement with the Securities and Exchange Commission to raise capital as a special purpose acquisition company, or SPAC.  The elements of the SPAC structure are widely known in the business and investment community given that more than $20 billion of SPAC capital has been raised in the last four years, representing a material portion of all equity capital raised in the capital markets in total.  Churchill provided extensive disclosures of its regulatory structure and limitations, which, in any event, are exhaustively described in its public filings.

27.    Churchill Capital was also established in Delaware in June 2006 as the vehicle through which Churchill's sponsors would invest in Churchill and hold their equity interests in Churchill.  In July 2006, Churchill Capital purchased 3,035,000 shares of common stock in

Churchill.  A SPAC's common stock is valued based on the per-share value of the cash held in the SPAC's trust account.  Churchill's SEC filings proposed an $8.00 per share trust value, based on which the Churchill Capital common stock would be worth $24,280,000 upon the closing of a business combination.

28.    Assignee plaintiff Christopher Bogart was the Chief Executive Officer of Churchill and, through Churchill Capital, one of Churchill's sponsors and promoters (as that term is defined under the federal securities laws).  Bogart is a New York lawyer and business executive, having served as general counsel and a senior executive of Time Warner Inc. Churchill's other sponsors and promoters were Itzhak Fisher, Churchill's Chairman and an experienced corporate executive and entrepreneur, Elizabeth O'Connell, Churchill's Chief Financial Officer and a senior investment banker, and Nir Tarlovsky, Churchill's Executive Vice President and an experienced technology venture capitalist in Israel.

29.    In March 2007, Churchill completed its initial public offering on what was then the American Stock Exchange, with BofA as its lead underwriter.  Churchill raised approximately $110 million from public shareholders, almost all of which was put into a trust account to be used solely to finance a business combination or, if no business combination occurred, to be returned to the public shareholders.

30.    To provide Churchill with additional capital, Churchill Capital purchased concurrently with the IPO five million warrants for a purchase price of $5 million.  Those warrants had a strike price of $6 and given that Churchill's common stock would be expected to be at or above $8 per share in order to close a business combination, as described above, the warrants could be expected to have a value of at least $10 million upon the closing of a business combination.  Churchill Capital also agreed that in the event Churchill did not complete a business combination, its warrants would expire worthless and its common stock would not share

9

in the distribution of the trust fund. Churchill Capital and Churchill's sponsors did not receive any sort of compensation or management fee for their work on behalf of Churchill; their sole ability to make any money from their time, work and investment was to close a business combination. Those terms were key elements of Churchill's IPO and were described in detail in Churchill's SEC filings.

31.     Thus, the economic bargain underlying Churchill, as with most SPACs, is that the sponsors invest a significant amount of cash and also devote substantial time and effort to Churchill's affairs in exchange for equity that will be valuable if a business combination closes and worthless if one does not. In Churchill's case, Churchill Capital would either lose its entire cash investment of more than $5 million if Churchill did not close a business combination, or would own equity worth more than $34 million if it succeeded.

32.     Another key feature of the SPAC structure is that SPACs have a limited period in which to close a business combination before they are required to cease operations and liquidate. In Churchill's case, Churchill had 18 months from the date of its IPO (i.e., until early September 2008) to do so. That period could be extended once by six months (i.e., until early March 2009) in the event a letter of intent was in place before the expiry of the 18 month period.

33.     All of the foregoing structural and economic points were widely known in the capital markets, were the subject of extensive public disclosure by Churchill, and in particular were known in detail to IAI and ImageSat. Indeed, Churchill discussed its structure and timing issues a number of times with IAI.

34.     Following Churchill's IPO in March 2007, Churchill explored a number of potential business combinations, some of which remained under active consideration at the time Churchill first heard about ImageSat in April 2008. At that time, Churchill had only five months

left in its eighteen-month period to complete a business combination, a fact Churchill made clear to ImageSat and IAI.

35.     In April 2008, Churchill was approached with proposals that it consider ImageSat as the subject of a potential acquisition.  Churchill conducted a preliminary evaluation and determined that ImageSat could be a suitable acquisition candidate among others then already under consideration.  Churchill retained BofA as its financial advisor for a potential ImageSat transaction, Churchill executed a confidentiality agreement with ImageSat, and Churchill and its advisors conducted basic due diligence about ImageSat.

36.     On May 7, 2008, Churchill made a formal proposal to acquire ImageSat. Churchill was quickly informed that the ImageSat board of directors (including its IAI representatives) had discussed the proposal and had appointed a special committee to review it. Churchill met with the special committee in Connecticut on May 16, and a representative of the committee had a separate lengthy discussion with BofA in New York on May 21.

37.     ImageSat represented that it was seriously interested in Churchill's proposal, and asked that Churchill attend its next board of directors meeting.  Churchill did in fact attend the board meeting, in Toronto, Canada on May 28, and spent two hours making an extensive presentation to the board, including IAI's three director designees.   Hard copies of that presentation, which was prepared by Churchill and Bank of America, were left with each board member, and outlined Churchill's structure and the time constraints on it to consummate a business combination.   Churchill also discussed those issues extensively during its oral presentation.

38.     IAI later informed Churchill that it had taken the May 7 proposal to its own board of directors for approval, and that such approval had been obtained.

39.    Following the May 28 board meeting, ImageSat's feedback to Churchill was that it remained committed to try to get a deal done, and Churchill began conducting more extensive due diligence.   ImageSat, for its part, began preparing diligence materials to assist in the diligence process.   Detailed due diligence then proceeded for a number of weeks.   During the diligence period, Churchill had ongoing interactions with IAI Corporate Vice President (and ImageSat Executive Chairman) Arzi as well as the IAI-appointed ImageSat CEO, Eckhaus.   Arzi and Eckhaus were the primary points of contact for Churchill in discussing a transaction, and Arzi repeatedly made it clear that he was in charge of any transaction negotiations or discussions.

40.    On July 16, 2008, Churchill provided a revised detailed offer to ImageSat based on the results of due diligence and market conditions.   The presentation of that revised offer kicked off an intensive period of negotiations which continued to include the active participation of IAI executive Arzi.   Moreover, IAI consistently provided its own feedback to Churchill about its needs and conditions to proceed with a transaction.

41.    By mid-August 2008, the discussions had progressed to a point where the parties were negotiating language for a detailed letter of intent.   IAI remained a key player in the discussions.   The parties had also moved to involving outside lawyers; the New York office of the Milbank firm was actively involved, representing ImageSat, and IAI gave its consent for Churchill to retain the New York office of the Paul Weiss firm despite a conflict that arose because other Paul Weiss attorneys in New York were already representing IAI in litigation against it by certain minority shareholders and former employees of ImageSat.

42.    After extensive negotiations led by IAI executive Arzi, which also included other IAI executives, a detailed letter of intent was agreed between Churchill and ImageSat in the last week of August 2008, and was approved then by ImageSat's board, including by IAI's representatives thereon.   The letter of intent was signed by both Churchill and ImageSat during

the following week.  The letter of intent provided for it to be governed by New York law and for any claims relating thereto to be brought in this Court.

43.     With the letter of intent signed and the key terms of a business combination agreed, attention turned to finalizing the transaction and preparing it for the US public markets. Churchill's life had been extended until early March 2009 by virtue of its having a signed letter of intent for a qualifying merger, but six months was not an abundant amount of time to take a merger between a US public company and an Israeli satellite operator through the SEC and to market before Churchill's drop dead date.  Churchill emphasized this point in a letter to ImageSat and IAI.

44.     On August 28, 2008, IAI executive Arzi informed Churchill that he had been put in charge of getting the transaction completed.  On September 2, 2008, a multi-hour meeting was held in New York among bankers and lawyers for Churchill and ImageSat to agree on the process to complete the transaction.  As is typical of large, complex corporate transactions, a substantial amount of activity commenced.  For example, ImageSat's CEO came to New York in early September to present ImageSat to bankers and research analysts at BofA.  BofA hired its own counsel at the Shearman & Sterling firm.  Legal drafting commenced.  Merger agreements were circulated.  Tax structuring was discussed.  Churchill retained a second investment bank as its fairness opinion provider.  A myriad of other issues, such as the composition of the company's board of directors following the transaction, were discussed.  IAI was an active participant in this process.  Among other interaction, IAI's CEO, Nissan, met more than once in September with Churchill about the progress of the transaction.

45.     While a substantial amount of transaction activity had been occurring in New York, on September 13, Churchill representatives flew to Israel at IAI executive Arzi's request to engage in further discussions about the transaction. A number of days of intensive, high-level

discussions then ensued between Churchill and IAI, involving at various times the entire IAI team as mentioned earlier, including IAI's CEO Nissan. The essence of those discussions was the extent to which IAI wanted to remain involved in ImageSat following a transaction, the services IAI would offer to ImageSat, and the ability of IAI to use the Churchill transaction to resolve fully the litigation claims pending and threatened against it. At IAI's request, Churchill engaged in negotiations on IAI's behalf with other shareholders in ImageSat to understand the range of potential options.

46.    The IAI discussions were sufficiently productive that IAI asked Churchill CEO Bogart to delay his return to New York from Israel and stay in Israel over the weekend of September 20-21 so that further discussions could occur early the following week in advance of an IAI board meeting.

47.    Bogart then spent the entire day, until late into the night, on September 21 at IAI's offices in discussions about transaction structure, and spent the next day, September 22, in Tel Aviv continuing those discussions. Also on September 22, an IAI lawyer transmitted some "major deal points" to counsel for Churchill. The issues being discussed (including the e-mailed deal points) principally concerned IAI's post-transaction role in the company and the extent to which IAI was prepared to give up value in order to achieve a full release of the litigation claims against it. IAI's statements and behavior conveyed to Churchill that IAI was deeply troubled by the existence of the litigation and placed a high value on the full and final resolution of the claims concurrent with the closing of the merger.

48.    On September 23, the finance committee of the IAI board of directors met, and on September 24, the full IAI board met and discussed the Churchill transaction.

49.    On the morning of September 25, IAI executive Klein telephoned Churchill executive Tarlovsky and informed him that the IAI board of directors had approved a form of the

Churchill transaction that had been the subject of the earlier discussions between IAI and Churchill. Tarlovsky reported that news to the other Churchill executives in an email at 8:06 a.m. that morning. At 9:08 a.m. that same morning, Bogart e-mailed the news from IAI to counsel for ImageSat, Pegasus (the largest debtholder in ImageSat), and others.

50.    In addition to discussing the points raised in the IAI September 22 e-mail orally with IAI representatives while he was in Israel, Bogart replied to the September 22 e-mail in writing on September 25, confirming, *inter alia*, that a request by IAI to remove its guarantee of certain ImageSat bonds (a guarantee for which ImageSat had already paid IAI) at closing was not a viable economic possibility. Bogart and IAI had discussed the bond issue extensively prior to this September 25 e-mail and had jointly analyzed the amount of cash ImageSat would have available at closing, and had concluded that there was insufficient cash available to release the IAI bond guarantee (as doing so would require ImageSat to cash collateralize the bonds). Unsurprisingly, given that the issue had already been discussed extensively and was more a question of ImageSat's practical ability to restructure its balance sheet than an issue of negotiation, IAI said nothing further on the point, particularly as the issue was in IAI's, and not Churchill's, control given that it turned on how much cash ImageSat had on hand at closing.

51.    The transaction approved by the IAI board of directors essentially divided up the total consideration being provided by Churchill among the various ImageSat shareholders and claimholders. The message from IAI to Churchill was essentially, "if you can get the other folks to accept their shares, then we will go along". Thus, Churchill and various other parties then commenced active negotiations – set against the backdrop of the rapidly ticking clock of Churchill's fading existence – to get the other relevant parties to go along with the economic divisions proposed by IAI. Churchill took IAI at face value and believed that IAI was operating in good faith and was committed to participate in the transaction, rather than misusing the

transaction discussions as a vehicle for establishing the amount for which each of the other ImageSat parties would relinquish their claims against IAI.

52.     The discussions with the non-IAI parties came to a head on Friday, October 3, at an all-day meeting at the offices of IAI's lawyers in New York, attended by representatives of a number of parties along with IAI executives Eldar and Klein.  At that meeting, it became clear that the group of plaintiffs already litigating against IAI would not proceed with the proposed transaction for the share of consideration then being proposed by IAI to be allocated to them.

53.     On Sunday, October 5, IAI informed Churchill that it would reduce its share of the transaction's consideration by $5 million so that the additional amount could be allocated to the plaintiffs.  Churchill continued to believe that IAI was operating in good faith rather than seeking only to establish the settlement value of the plaintiffs' claims.

54.     With this extra consideration and IAI's encouragement, Churchill resumed its efforts to broker a deal among the minority shareholders and other stakeholders.  Moreover, the past conduct of IAI's representatives on the ImageSat board had been such that ImageSat's directors'-and-officers' liability insurer was prepared to contribute to the Churchill transaction in order to resolve the litigation claims, and those funds too were available to Churchill in its effort to close a deal.  Finally, and unbeknownst to IAI, Churchill and BofA had discussed the situation at length and BofA had expressed the view that as a matter of presenting the transaction to the public markets, it would be preferable to raise somewhat the total consideration rather than having the transaction proceed without disposing of all the litigation claims.  The result of all these events was that only Churchill knew in total – between the extra IAI contribution, the insurance proceeds, and the extra BofA-suggested consideration – how much money was available to close a deal.  Moreover, the structure of the transaction had altered so that rather than every party signing onto a single definitive agreement, here each party would sign its own

definitive agreement with Churchill, so that none of the sellers would know in advance what amount of consideration any other seller was receiving.

55.     By Monday, October 6, Churchill's negotiations had progressed to a point where Churchill was becoming confident of being able to deliver all the necessary parties to the transaction within the economic parameters established by IAI.  The lawyers had revised the definitive documents.  Work had commenced towards a public announcement of the transaction. Moreover, the rapidly approaching Yom Kippur holiday, which began at sunset on October 8 and after which IAI would be either closed or functioning slowly for a number of days, was a critical factor in the deal timetable, and tremendous efforts were being made to sign up the deal before Yom Kippur so that work could proceed in New York even while offices in Israel were largely closed.  There had been extensive discussions with all parties about the transaction's timing, about the need to proceed rapidly, and about Churchill's time-based structure.  There had been no suggestion from IAI that it had any substantive open issues or that the timing being followed by all parties, including ImageSat's and IAI's own lawyers, was not achievable.

56.     However, IAI and its lawyers – while making no objection to the economic terms of the transaction – had become extremely agitated about not knowing how much money the plaintiffs and other parties were to receive.  That behavior struck Churchill as peculiar given that IAI was getting its agreed amount from the transaction.  Churchill did not disclose the full economic terms of the arrangements with the minority shareholders to IAI.  This sent IAI into a tizzy.  It was only at this point that Churchill began to doubt IAI's good faith and question its intentions.  Churchill, however, did not have long to wait until IAI's true intentions would be revealed.

57.     On October 7, after definitive documents had been distributed, an IAI lawyer sent Churchill an e-mail that was so breathtaking in its audacity and so disconnected from the

extensive efforts of the past weeks that it stopped the transaction in its tracks.  In the e-mail, IAI indicated, *inter alia*, that it needed approval from its board of directors to sign any deal (despite having previously told Churchill that board approval had already been obtained) and could only get such approval weeks later at the next regular IAI board meeting; that it demanded a release from the bond guarantee discussed previously, which Churchill had explained weeks previously was impossible (a position that had never been objected to or raised again by IAI); that IAI had a number of other "major deal points" in addition to these "initial comments" (on a transaction that had been extensively negotiated for months); and that there would be "additional general comments" as well as "more detailed comments, etc." after Yom Kippur.  IAI would have been fully aware that this e-mail would make it impossible to proceed with the deal as planned, particularly as IAI's executives in Israel then became unavailable.

58.     Over the next twenty-four hours, IAI's lawyers and Churchill exchanged a number of e-mails.  Essentially, Churchill took the view that IAI was acting in bad faith and that IAI's conduct reflected that it had been misusing the Churchill transaction "to ascertain an acceptable settlement level for the plaintiffs' litigation and had no intention of proceeding with a transaction".  For its part, IAI admitted that it was "aware of the time frame", but IAI nevertheless stuck to its guns and refused to proceed.  In a subsequent conversation, IAI devoted considerable attention to attempting to learn the amounts being paid to the plaintiffs, confirming Churchill's suspicions of its bad faith intent.

59.     Churchill's allegations of bad faith and its raising the prospect of litigation against IAI appeared to have influenced IAI's lawyers in New York, and they came back to Churchill during the Yom Kippur holiday to discuss the matter further while noting that their client remained unavailable due to the holiday.  Churchill could not tell whether these were genuine, good-faith discussions or a continued IAI effort to extract the economic information that

Churchill had still not provided about settlement ranges, but Churchill nevertheless engaged in those discussions as so much time had passed that it needed to close the ImageSat deal or else face liquidation and certain losses.

60.     On October 12, after Yom Kippur had concluded and IAI's lawyers had been able to consult with their client, IAI's lawyers e-mailed Churchill again.  The very first demand in the IAI e-mail was:  "IAI requires immediately the full disclosure, in writing, of all the elements of the deal with all interested parties."  IAI also continued to demand a release from its bond guarantee, although it did acknowledge that it had never replied to Churchill's rejection of that demand weeks earlier and that it had raised it – a condition it knew was impossible to fulfill – at the eleventh hour.

61.     Churchill replied on the next day, expressing a continued willingness to do a deal but suggesting that IAI was making this impossible with its unreasonable and unattainable eleventh-hour demands.  Churchill also asked:  "Why is IAI so concerned with what other people are being paid?  The economics to IAI are not being altered.  This is a public deal so of course the terms will become public; the issue is just a timing one.  Is IAI saying that it will now reject an economic offer it previously said was acceptable if it does not like the deals we have cut with some minority shareholders . . . ?"  IAI never answered Churchill's inquiry, but simply continued to insist on knowing the terms being given to the plaintiffs.

62.     On October 16, IAI reiterated that it would not proceed without disclosure of the amounts being paid to the plaintiffs and that it would not return to the previously agreed transaction terms.

63.     Therefore, on that same day, Churchill sent the following email to all the parties to the ImageSat transaction: "Last Tuesday, at a point when we believed that there was sufficient economic agreement among the current ImageSat shareholders for a transaction between

ImageSat and Churchill to proceed, IAI communicated to us a number of further unilateral requirements for IAI's participation in a transaction. Those requirements were inconsistent with the letter of intent and were clearly both unacceptable and unachievable. We informed IAI of that immediately and have had a series of subsequent communications with IAI's lawyers, but IAI has not materially altered its position. Without IAI's participation, we are unable to proceed. Accordingly, we are suspending our efforts with respect to an ImageSat transaction."

64.     Despite Churchill's e-mail, discussions continued among the ImageSat shareholders about an ImageSat-Churchill transaction. Those discussions occurred largely without Churchill's direct involvement, although Churchill was kept informed of them and was asked not to proceed into liquidation. By the weekend of November 1-2, 2008, there appeared to be sufficient progress that one last attempt to revive a deal might make sense. Thus, Churchill convened a meeting of all parties in New York on November 3 to see if a deal could be reached.

65.     At the meeting on November 3, Churchill was repeatedly told by IAI that it needed to know the amounts being paid to the other parties in order to proceed with a transaction. IAI continued to offer no rationale for this demand. Finally, after several hours of inconclusive meetings, Churchill gave in and disclosed in a one-on-one session with IAI's lawyer the economic structure of the deal, based on the IAI-suggested premise that doing so would eliminate the logjam that was blocking the deal from proceeding. However, shortly after apparently obtaining what IAI had come for, IAI returned to the meeting, announced its unwillingness to budge on any of the other "open issues" it had manufactured, and effectively terminated discussion of the transaction.

66.     As IAI knew, Churchill had for some time been working solely on the ImageSat transaction in reliance on IAI's board approval thereof and the ImageSat parties' collective expressed intent to proceed with the transaction. Thus, when IAI made it impossible to proceed,

Churchill was left with no other deal to do and insufficient time in which to take another transaction from inception to closing before its required liquidation date. Thus, it was an inexorable consequence of IAI's actions that Churchill would liquidate and dissolve.

67.     On November 21, 2008, Churchill announced its intention to liquidate and dissolve, and filed a preliminary proxy statement in that regard with the SEC.

68.     Churchill did indeed liquidate and dissolve on December 21, 2008. Churchill Capital's common stock did not participate in the liquidation, pursuant to its terms, and Churchill Capital's warrants expired worthless. Thus, Churchill's founders, through Churchill Capital, lost: (i) their cash investment of more than $5 million; (ii) their expected equity value (above cash basis) of more than $29 million; (iii) the time and effort they had put into Churchill, both generally and with respect to the ImageSat transaction; and (iv) various out-of-pocket expenses and a substantial amount of reputational damage and goodwill.

69.     This is not a situation where commercial parties, despite good-faith efforts, failed to reach agreement on the terms of a transaction. It is not even a situation in which a party initially intended to seek a deal, but then, before making a final commitment, simply changed its mind. Rather, what occurred here is that IAI cynically and tortiously pretended to be interested in a transaction that it never genuinely intended to document and close, for reasons of its own, and despite knowing that in carrying out its malicious plan, it would cause Churchill Capital substantial losses. IAI's conduct violates applicable standards of conduct and business ethics, and intentionally caused millions of dollars in damages for which it should be held accountable.

## AS AND FOR A FIRST CLAIM FOR RELIEF

### (For Tortious Interference with Churchill Capital's Prospective Economic Advantage)

70.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

71.     Through its IPO as a SPAC, Churchill possessed cash assets of approximately $110 million that it sought to invest in a merger with or acquisition of a suitable target company. As the sponsors of Churchill, Bogart and the other principals of Churchill Capital stood to earn substantial profits if Churchill successfully consummated a transaction, but to lose their entire investment of more than $5 million if Churchill failed to do so.

72.     IAI knowingly and intentionally induced Churchill and its sponsors to spend substantial time, effort, and money over a period of months negotiating an acquisition of ImageSat, even though IAI, whose consent to and participation in any acquisition were required, had no genuine intention of allowing an acquisition to be documented and closed but was engaging in the discussions for its own bad faith reasons.  IAI engaged in this conduct despite knowing that Churchill would not have time to pursue potential alternative transactions if the ImageSat transaction did not proceed, only to subvert the negotiations and cause them to fail at a time when IAI knew it would be too late for Churchill to locate any alternative transaction.

73.     As a proximate result of IAI's conduct, Churchill was unable to secure any business combination transaction and was forced to liquidate, with the foreseeable and inevitable result that Churchill Capital suffered damages including but not limited to the loss of their entire investment of more than $5 million and the loss of their equity value in Churchill.

74.     IAI acted in bad faith and used wrongful and oppressive means and tactics, for wrongful motives, in interfering with Churchill's and its sponsors' prospective advantageous

business relations with ImageSat pursuant to the merger that would have been consummated but for IAI's wrongful conduct, as well as its prospective advantageous business relations with other companies, one of which could have become Churchill's transaction partner had Churchill not been diverted by IAI's feigned interest in bringing about the acquisition of ImageSat by Churchill.

75.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than $35 million.

76.     Additionally, because IAI's conduct was willful and wanton and exhibited a high degree of moral culpability, IAI should be ordered to pay to Plaintiff punitive or exemplary damages, in an amount to be determined at trial, but not less than $35 million.

## AS AND FOR A SECOND CLAIM FOR RELIEF

### (For *Prima Facie* Tort)

77.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

78.     Through its IPO as a SPAC, Churchill possessed cash assets in excess of $110 million that it sought to invest in a merger with or acquisition of a suitable target company. Churchill Capital stood to earn a substantial profit if Churchill successfully consummated a transaction, but to lose their entire investment of more than $5 million if Churchill failed to do so.

79.     IAI knowingly and intentionally induced Churchill and its sponsors to spend substantial time, effort, and money over a period of months negotiating an acquisition of ImageSat, even though IAI, whose consent to and participation in any acquisition were required, had no genuine intention of allowing an acquisition to be documented and closed, but was instead engaging in the discussions for bad faith reasons.  IAI engaged in this conduct despite

knowing that Churchill would not have time to pursue potential alternative transactions if the ImageSat transaction did not proceed, only to subvert the negotiations and cause them to fail at a time when IAI knew it would be too late for Churchill to locate any alternative transaction.

80.     As a proximate result of IAI's conduct, Churchill was unable to secure any business combination transaction and was forced to liquidate, with the foreseeable and inevitable result that the members of Churchill Capital, including Bogart, suffered damages including but not limited to the loss of their entire investment of more than $5 million and the loss of their equity value in Churchill.

81.     IAI acted in bad faith and used wrongful and oppressive means and tactics while damaging Churchill and its sponsors through conduct intended to cause harm, actuated by disinterested malevolence and constituting a *prima facie* tort.

82.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than $35 million.

83.     Additionally, because IAI's conduct was willful and wanton and exhibited a high degree of moral culpability, IAI should be ordered to pay to Plaintiff punitive or exemplary damages, in an amount to be determined at trial, but not less than $35 million.

### AS AND FOR A THIRD CLAIM FOR RELIEF

**(For Breach of the Duty to Negotiate in Good Faith)**

84.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

85.     As set forth above, Churchill and IAI entered into negotiations aimed toward an acquisition of ImageSat by Churchill, to the point that, among toher things, IAI advised Churchill that its board had approved the transaction. This constituted at least a preliminary commitment whereby the parties agreed on major terms of a transaction, while leaving the

remaining terms open for further negotiation between themselves and among the other necessary parties to the transaction.

86.     The negotiations between the parties advanced to the stage that IAI advised Churchill that its board of directors had approved the transaction. By this and other conduct, IAI expressly and/or impliedly committed and represented that it was sincerely interested in working to achieve a successful transaction and that it would negotiate in good faith in an effort to reach an agreement.

87.     Instead, IAI knowingly and intentionally induced Churchill and its sponsors to spend substantial time, effort, and money over a period of months negotiating an acquisition of ImageSat, even though IAI, whose consent to and participation in any acquisition were required, had no genuine intention of allowing an acquisition to be documented and closed, but was instead engaging in the discussions for bad faith reasons. IAI engaged in this conduct despite knowing that Churchill would not have time to pursue potential alternative transactions if the ImageSat transaction did not proceed, only to subvert the negotiations and cause them to fail at a time when IAI knew it would be too late for Churchill to locate any alternative transaction.

88.     As a proximate result of IAI's conduct, Churchill was unable to secure any business combination transaction and was forced to liquidate, with the foreseeable and inevitable result that the members of Churchill Capital, including Bogart, suffered damages including but not limited to the loss of their entire investment of more than $5 million and the loss of their equity value in Churchill.

89.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than $35 million.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

### (For Promissory Estoppel)

90.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

91.     As set forth above, Churchill and IAI entered into negotiations aimed toward an acquisition of ImageSat by Churchill, constituting a preliminary commitment whereby the parties agreed on certain major terms of a transaction, while leaving the remaining terms open for further negotiation between themselves and among the other necessary parties to the transaction.

92.     During such negotiations, IAI expressly and impliedly committed and represented that it was sincerely interested in working to achieve a successful transaction and that it would negotiate in good faith in an effort to reach final agreement.

93.     Instead, IAI knowingly and intentionally induced Churchill and its sponsors to spend substantial time, effort, and money over a period of months negotiating an acquisition of ImageSat, even though IAI, whose consent to and participation in any acquisition were required, had no genuine intention of allowing an acquisition to be documented and closed, but was instead engaging in the discussions for bad faith reasons.  IAI engaged in this conduct despite knowing that Churchill would not have time to pursue potential alternative transactions if the ImageSat transaction did not proceed, only to subvert the negotiations and cause them to fail at a time when IAI knew it would be too late for Churchill to locate any alternative transaction.

94.     As a proximate result of IAI's conduct, Churchill was unable to secure any business combination transaction and was forced to liquidate, with the foreseeable and inevitable result that Churchill Capital suffered damages including but not limited to the loss of its entire investment of more than $5 million and the loss of its equity value in Churchill.

95.    IAI's wrongful conduct subjects it to liability under the doctrine of promissory estoppel.

96.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than $35 million.

WHEREFORE, Plaintiff respectfully demands judgment against Defendant:

A.    On the First Claim for Relief, in the amount of Thirty-Five Million Dollars ($35,000,000) in compensatory damages and Thirty-Five Million Dollars ($35,000,000) in punitive or exemplary damages;

B.    On the Second Claim for Relief, in the amount of Thirty-Five Million Dollars ($35,000,000) in compensatory damages and Thirty-Five Million Dollars ($35,000,000) in punitive or exemplary damages;

C.    On the Third Claim for Relief, in the amount of Thirty-Five Million Dollars ($35,000,000) in compensatory damages;

D.    On the Fourth Claim for Relief, in the amount of Thirty-Five Million Dollars ($35,000,000) in compensatory damages;

E.    Granting Plaintiff pre-judgment interest on all sums awarded at the maximum rate prescribed by law; and

F.  Granting Plaintiff such other and further relief as the Court may deem just and proper, including the costs, disbursements, and attorneys' fees of this action.

Dated:  New York, New York
        May 21, 2009

GANFER & SHORE, LLP

By: _____
    Ira Brad Matetsky
    William D. McCracken
    360 Lexington Avenue
    New York, New York 10017
    (212) 922-9250
    *Attorneys for Plaintiff*